IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LORRI ZAHAVI, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 07- 376 |
| | ) | ELECTRONICALLY FILED |
| v. | ) | |
| | ) | |
| THE PNC FINANCIAL SERVICES | ) | Magistrate Judge Lisa Pupo Lenihan |
| GROUP, INC., and PNC BANK CORP., | ) | |
| | ) | Doc. No. 34 |
| Defendants. | ) | |
| | ) | |

**OPINION**

<u>LENIHAN</u>, M.J.

Currently before the Court for disposition is Defendants' Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56(b) (Doc. No. 34). The only claim remaining in this employment discrimination case is Plaintiff's claim that PNC "regarded" her as disabled and terminated her employment in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (1990) ("ADA"). Defendants request summary judgment in their favor on Plaintiff's "regarded as" disability discrimination claim on three grounds: (1) Plaintiff cannot establish that any decision makers regard her as disabled under the law as required to establish a *prima facie* case of discrimination; (2) Plaintiff cannot establish that any misconception about her physical or mental impairments caused or motivated her termination as required to establish a *prima facie* case of discrimination; and (3) even if Plaintiff could establish a *prima facie* case of "regarded as" disability discrimination, she can present no evidence to show that PNC's stated reason for her termination was a pretext for "regarded as" disability discrimination.

For the reasons set forth below, the Court will grant Defendants' Motion for Summary

Judgment.

## I.    **RELEVANT FACTS**

Plaintiff, Lorri Zahavi, was employed by Defendants, The PNC Financial Services Group, Inc. and PNC Bank, N.A. (collectively "Defendants" or "PNC") and their predecessors from 1984 until April 14, 2005. (PNC's Separate Stmt. of Undisputed, Material Facts in Supp. of Summ. J. (Doc. No. 36), ¶ 1.) At the time of her discharge, Zahavi held the position of Credit Analyst II (underwriter) with the Indirect Underwriting Team in the Consumer Underwriting Department within PNC's Consumer Loan Center. (*Id.* at ¶ 7.) Zahavi's direct supervisor was Michael Gallagher, Team Leader. Gallagher reported to the Underwriting Manager, Lou DeFalco. (*Id.* at ¶ 8.) In addition to Zahavi, PNC employed four other underwriters on its Indirect Underwriting Team ("Team"). (*Id.* at ¶ 9.) Zahavi's primary customers were automobile dealers, not consumers who were seeking the automobile loans. (*Id.* at 10.) Zahavi had a very good relationship with the automobile dealers, and they would often call her directly when another member of the Team denied an automobile loan application. (Doc. No. 36, ¶ 10; Zahavi Dep. at 107-09, 121-22.)

The loan application process utilized by the Indirect Underwriting Team can be summarized as follows. An automobile dealer would gather information from customers directly and enter loan applications into an electronic processing system, which PNC underwriters, such as Zahavi, could access. (Doc. No. 36, ¶ 11.) PNC underwriters then reviewed the data collected by the dealer to determine whether PNC should approve an automobile loan. (*Id.* at ¶ 12.) In deciding whether PNC should accept or decline the loan request, underwriters, including Zahavi, considered several factors to determine the borrower's ability to repay the automobile loan, which factors included the

borrower's income, debt, personal credit scores, and overall credit worthiness. (*Id.* at ¶ 13.)

A crucial factor that the underwriters also considered was the borrower's debt ratio. The debt ratio is the percentage of the borrower's monthly gross income that goes toward paying debts. Under PNC's Maximum Debt Ratio Guidelines, an underwriter has no authority to approve a loan with a debt ration that exceeds 75%. (*Id.* at ¶ 14.) If the debt ratio exceeds the Maximum Debt Ration Guidelines, the underwriter is required to either decline the loan or seek a designated manager's approval. (*Id.* at ¶ 15.)

As a PNC employee, Zahavi was required to abide by PNC's Code of Ethics. (Doc. No. 36, ¶ 2.) Zahavi repeatedly agreed in writing that she had received, read, understood, and would comply with PNC's Code of Ethics. (*Id.* at ¶ 3.) PNC's Code of Ethics provides in pertinent part: "All PNC personnel shall maintain the highest standards of loyalty, care and candor in all matters relating to our shareholders, customers, employees and regulators." (*Id.* at ¶ 4.)

In addition, the PNC Bonding Requirements Policy provides that to continue employment with PNC, employees must remain eligible for coverage under PNC's fidelity bond. (*Id.* at ¶ 5.) The PNC Bonding Requirements Policy further provides that "bond coverage may terminate for any employee as soon as PNC learns of any dishonest or fraudulent act that was or may have been committed by the employee at any time, whether or not the act was committed while in PNC's employment." (*Id.* ¶ 6.)

On December 2, 2001, Zahavi was hospitalized for a brain aneurysm. Following a medical leave of absence, Zahavi testified that she returned to her position (within four months) at PNC without any restrictions. Zahavi admitted that her duties and responsibilities did not change when she returned from her medical leave. (*Id.* at ¶ 16.)

In September 2002, Zahavi underwent elective surgery to remove a second aneurysm from which she claims to have fully recovered except for having lost her sense of smell. (*Id.* at ¶ 17; Doc. No. 41 at ¶ 17.) Zahavi testified that after the second surgery, she did not have any cognitive difficulties, and with regard to her job profile, she was able to perform all of those functions/tasks, and she still had the same skills and abilities. (Zahavi Dep. at 64-66.) According to Zahavi, Gallagher never told her that she was unable to perform any of the functions required of her position or that her skills or abilities had diminished. (Doc. No. 36, ¶ 18.) Zahavi also admitted that from 2001 until her termination, Gallagher gave her positive performance evaluations. (*Id.* at ¶ 19.) Zahavi also admitted that Gallagher considered her a good employee. (*Id.* at ¶ 20.)

In 2002, DeFalco was involved with a work from home initiative and approved Zahavi's request to work at home following her surgery, as she satisfied the time on the job and productivity criteria. (DeFalco Dep. at 64-65.) At the time he approved the request, DeFalco stated he was not aware of the November 4, 2002 letter from Zahavi's neurosurgeon requesting that she be allowed to work from home, but believed her request was based on her belief that she could be more productive. (DeFalco Dep. at 65; Ex. 9 to DeFalco Dep.)[1] Gallagher and DeFalco always considered Zahavi to be one of the top producers of the Indirect Underwriting Team. (*Id.* at ¶ 21.) According to Zahavi, it was known on the Team that she processed "60 percent of the [loan] volume that walked in the door." (*Id.*)

After her surgery, Zahavi questioned her supervisors on several occasions when a new policy

---

1.  In her deposition, Zahavi stated that when she came back to work after her surgery, Gallagher mentioned to her the possibility of working at home. (Zahavi Dep. at 60.) She later stated in her declaration that when she returned to work in November of 2002, she requested from Gallagher the accommodation of working at home due to her medical condition and forwarded her neurosurgeon's letter to Tina Jones in PNC's human resources department. (Zahavi Decl. (Doc. No. 39-3), ¶ 6.)

came into play that she did not think was quite right, and both DeFalco and Gallagher would respond, "you just don't get it." (Zahavi Dep. at 67, 70-74; DeFalco Decl., ¶ 6.) DeFalco and Gallagher made the same remark when she questioned their loan decisions. (Doc. No. 39, ¶ 17.) DeFalco admits that he sometimes would use that language with Zahavi, but he explained that she would just not accept that established policies had to be followed. (DeFalco Decl., ¶ 6.) According to Zahavi, when other underwriters raised similar questions at Team meetings, they were not addressed in that manner by DeFalco or Gallagher. (Zahavi Dep. at 228.) However, Zahavi further stated that she had no knowledge of whether DeFalco or Gallagher made comments like, "you just don't get it" to anyone else outside of those meetings. (Zahavi Dep. at 96.) DeFalco stated in his declaration that he spoke similarly with other underwriters when they failed to follow loan approval policies and procedures. (DeFalco Decl., ¶ 6.) Zahavi interpreted the comments, "you just don't get it," made by her supervisors, as references to diminished intelligence related to her aneurysms. (Zahavi Dep. at 187-88, 191-92.) However, she never reported any complaints of discrimination to anyone at PNC during her employment. (*Id.* at 162-63.)

In December of 2004, PNC's Risk Management Credit Review Department ("RMCR") performed a review of the indirect underwriting department and provided a draft report to DeFalco for his response prior to finalizing the report. (Pl.'s Counterstmt. of Mat. Facts (Doc. No. 39), ¶ 8.) One of the findings cited in the draft RMCR December 2004 report was that 27 errors had been made by the indirect underwriting department in evaluating used cars as collateral, referred to as the "loan to value" or "LTV," of which 14 were attributable to Zahavi, and the remaining 13 were evenly distributed to the other underwriters in the Team. (DeFalco Dep. at 33-36.) On the basis of that finding, DeFalco and Gallagher met with Zahavi on January 20, 2005, to discuss this finding

and issued a verbal warning to Zahavi. (Doc. No. 39, ¶ 10.) DeFalco and Gallagher also requested an individual targeted review of her loans from RMCR. (*Id.*) DeFalco testified that Gallagher also counseled the other underwriters who made errors noted in the draft RMCR report. ((DeFalco Dep. at 37.)

On January 31, 2005, Zahavi received a performance review for the calendar year 2004, which indicated that "[a]lthough indirect exception rates came in above management's expectations @ 14.85%, overall credit quality remained strong. Lorri continues to do a good job with her recognition of policy exceptions and overrides. She supports her exceptions and overrides with sufficient documentation, but improvement needs to be made in the area of calculating used car values." (Ex. 2, DeFalco Dep. (Doc. No. 39-4).) She was given an overall performance rating of "Achieves" for 2004. (*Id.*)

On or about March 17, 2005, after RMCR's completion of the targeted review of Zahavi's loans, DeFalco and Gallagher met with Zahavi again to discuss the results. (Doc. No. 39, ¶ 11.) The targeted review indicated that any problem with LTV calculations had been reduced to acceptable limits, although there were some "irregularities" with regard to "netting" and "grossing" of income, those irregularities were discussed with the department as a whole later in the meeting and were not the subject of a verbal warning to Zahavi. (*Id.* at ¶ 12.)

Also in March of 2005, Gallagher and DeFalco met with Zahavi to discuss complaints from two other underwriters on the Team, indicating that dealers were contacting Zahavi to review loans that the other underwriters had denied and she was approving them, and thus, undermining their

credibility and authority.[2]  (DeFalco Dep. at 42-43; Zahavi Dep. at 106-07, 199-120.)  According to DeFalco, PNC's standard underwriting practice was that if a dealer called a different underwriter than the one who originally processed the loan application to appeal the original underwriter's decision, and if additional information was obtained from the dealer which indicated the loan could be approved, the new information was to be referred to the original underwriter first for reconsideration.[3]  (DeFalco Dep. at 43.)  Zahavi was reminded to follow this practice at the March 2005 meeting, and she agreed to show any decline that a dealer appealed to her to the original underwriter first.  (Zahavi Dep. at 107; DeFalco Dep. at 46.)

Zahavi admitted at her deposition that PNC had written loan approval guidelines that underwriters were required to follow in reviewing loan applications.  (Zahavi Dep. at 137.)  During her 17 years as a loan officer at PNC, the loan underwriting guidelines changed numerous times, and Zahavi, as well as her fellow loan officers, including DeFalco, customarily exercised discretion and judgment in applying them to particular situations.  (Doc. No. 39, ¶ 15.)  She further testified that she was told by DeFalco that proof of additional income was only required if the deal "did not make sense."  (Zahavi Dep. at 134.)  When asked to explain what she thought DeFalco meant by that, Zahavi responded with an example–if a customer had additional income of $10,000 from baby-sitting, she would have questioned it because that just didn't make sense.  (*Id*. at 137.)  On the other hand, if a borrower had  "wonderful" credit, and the additional income made sense, she did not

---

2.  Zahavi's conduct was first brought to the attention of DeFalco and Gallagher sometime after January 20, 2005 when they  received complaints from other underwriters.  (DeFalco Dep. at 45.)

3.  According to Zahavi, her supervisors, Gallagher and DeFalco, were aware that dealers preferred working with her as opposed to Carbonaro, but refused to take action to correct the problems dealers had with Carbonaro.  (Pl.'s Resp. to Defs.' Stmt. of Facts (Doc. No. 41), ¶ 10 (citing Zahavi Dep. at 106-112).)

believe she was required to obtain written proof of additional income. (*Id.* at 137-38.)

On April 11, 2005, a risk analyst from RMCR met with DeFalco and raised concerns about two loans for the same borrower that RMCR reviewed during one of its routine audits. (Doc. No. 36, ¶ 28.) An automobile dealer submitted the first application to PNC on March 16, 2005, and listed monthly debts that exceeded gross monthly income, resulting in a debt ratio of 104.35%. (*Id.* at ¶ 29.) The second loan application, filed on March 18, 2005, was by the same borrower seeking to purchase the identical automobile from the same dealership as the first loan application. (*Id.* at ¶ 30.) However, the second loan application contained additional income without any documentation as to why it was accepted,[4] a reduction in the amount of the customer's debt due to an unexplained loan payoff,[5] and a trade-in with an unencumbered title, which caused DeFalco to be suspicious. (DeFalco Dep. at 53-54; DeFalco Decl. ¶ 10.) With the changes to income and debt in the second application, the debt ratio for this borrower had been reduced to 74.25%, just under the 75% threshold that would allow an underwriter to approve a loan without a manager's approval. (Doc. No. 36, ¶ 33.) According to DeFalco, at the time of the April 11, 2005 meeting, the RMCR risk analyst did not know the identity of the underwriter and DeFalco informed him that it was Zahavi. (DeFalco Dep. at 54.) Zahavi disputes this statement, contending that her loan officer number appears on the first page of the loan application, so anyone reviewing the deal would be able to determine that she was the underwriter. (Zahavi Decl., ¶ 2.)

Upon investigation, DeFalco determined that another underwriter from the Team, Cathy

_____

4. The first application listed gross income of $ 4,417, while the second one listed gross income of $6,317, a difference of $ 1,900 attributable to rental income. (Doc. No. 36, ¶ 31.)

5. The first application listed a monthly payment for a motorcycle loan in the amount of $194 which was not included with the debts on the second application. (Doc. No. 36, ¶ 32.)

Renchko, handled the first loan application. Renchko had placed this loan application in a "pending" status and noted in the comment section of the on-line screen that "Dealer to Get Additional Income." (Doc. No. 36, ¶ 35.) PNC requires its underwriters to document any relevant actions related to the loan decision, including communication with the dealer, on the comments screen that is part of the on-line application process. (*Id.*) DeFalco further learned that Zahavi withdrew the first application and approved the second application with the reduced debt ratio. (Zahavi Dep. at 147; DeFalco Dep. at 53; DeFalco Decl., ¶¶ 10-11 & Ex. 2 thereto.) On the second loan application, Zahavi did not make any notations on the comments screen addressing the reason for the additional monthly income or explaining the omission of the motorcycle loan.[6] (DeFalco Decl., ¶ 12 & Ex. 2 thereto; DeFalco Dep. at 53-54.) Zahavi admits that she mistakenly omitted the motorcycle loan. (Doc. No. 41, ¶ 37.)

DeFalco discussed his findings with members of the RMCR, his manager, and Gallagher. (DeFalco Dep. at 54-55.) DeFalco stated that because it appeared that Zahavi was manipulating the documents to make the loan fit the guidelines, he recommended that Zahavi be terminated, and his manager and Gallagher agreed with the recommendation.[7] (*Id.* at 55.) At the suggestion of Matthew Fuss in PNC's Employee Relations department, DeFalco and Fuss met with Zahavi on April 13, 2005 to discuss their concerns over the two loan applications. During this meeting, DeFalco showed Zahavi the two loan applications and asked whether she manipulated the system

6. Zahavi denies that additional documentation of rental income was required; however, her citations to the record in support of this statement are so amorphous that the Court deems this statement to be unsupported.

7. Zahavi disputes that the lack of notation in the comments section or mistaken omission of the motorcycle loan support the conclusion that she was manipulating the documents and/or information on the loan application in order to falsely reduce the debt ratio so that the loan could be approved without a manager's review. (Doc. No. 41, ¶ 38.)

in order "to put the deal on the books." (Doc. No. 36, ¶¶ 39-41.) According to DeFalco, when he and Fuss presented the documents to Zahavi, she admitted that she deliberately manipulated the application so it could fit the guidelines. (DeFalco Dep. at 56.) Zahavi denies that she made any such admission, but rather, asserts that she did not say much, as she was very stunned and upset, and held back because she thought she was just going to be written up.[8] (Zahavi Dep. at 178.) She further testified that with regard to the lack of a notation regarding the additional income, she told DeFalco that previously, she had asked him about the memorandum and he had told her at the time that if the deal made sense, she did not have to ask for written proof of additional income.[9] (*Id.* at 177-79.) In her mind, Zahavi believed this loan made all the sense in the world to put together. (*Id.* at 179.) At the end of the meeting, Fuss informed Zahavi she was being placed on administrative leave until they decided what action would be taken. (DeFalco Dep. at 56.) Two days later, on April 15, 2005, Fuss called Zahavi to inform her that she was being terminated for falsifying application information. (*Id.*) PNC considers falsification of company documents to be a dishonest act, which makes the offending employee ineligible to be covered by PNC's fidelity bond, and thus no longer employable by PNC. (DeFalco Dep. at 56; Popp Decl., ¶ 11.)

Zahavi timely filed the instant law suit and this Court granted Defendants' motion to dismiss on Plaintiff's claim of discrimination based on gender. At the close of discovery, Defendants have filed the pending motion for summary judgment on the remaining claim–a "regarded as" disability discrimination claim under the ADA. The motion and response thereto have been fully briefed and

---

8. Zahavi maintains that she did deny DeFalco's accusations, however, her citations to the record in support of this statement are so amorphous that the Court deems this statement to be unsupported.

9. She also stated that it did not matter what she said because they were going to terminate her. (Zahavi Dep. at 177-78.)

are now ripe for disposition.

## II.    STANDARD OF REVIEW – MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    ANALYSIS

Disability discrimination claims under the ADA are analyzed under the familiar burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). *See Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.,* 60 F.3d 153, 157 (3d Cir. 1995). In order to make out a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate

that she (1) has a "disability;" (2) is a "qualified individual," and (3) has suffered an adverse employment action because of that disability. *Buskirk v. Apollo Metals,* 307 F.3d 160, 166 (3d Cir. 2002) (citing *Gaul v. Lucent Techs. Inc.,* 134 F.3d 576, 580 (3d Cir. 1998)); *Turner v. Hershey Chocolate U.S.A.,* 440 F.3d 604, 611 (3d Cir. 2006) (citing *Buskirk* and *Gaul, supra*). With regard to an individual, a "disability" is defined under the ADA as:

> (A)    a physical or mental impairment that substantially limits one of the major life activities of such individual;
>
> (B)    a record of such an impairment; or
>
> (C)    being regarded as having such an impairment.

42 U.S.C. § 12102(2) (1990).[10] In the case at bar, Zahavi claims that PNC regarded her as having a disability pursuant to part (C) of the ADA's disability definition. An individual is "regarded as" having a disability if she:

> (1)    Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;
>
> (2)    Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

---

10. The Court notes that Congress recently enacted the Americans with Disabilities Act Amendments Act of 2008, Pub.L. No. 110-325, 112 Stat. 3553, 110th Cong., 2d Sess. (Sept. 25, 2008). The effective date of the ADAAA is January 1, 2009. Although the court of appeals for this circuit has not yet opined as to whether the amendments should be applied retroactively, several district courts, including two from this circuit, as well as the Court of Appeals for the Fifth Circuit, have opined that these amendments do not apply retroactively. *See, e.g., E.E.O.C. v. Agro Distribution LLC,* 555 F.3d 462, 470 (5th Cir. 2009); *Supinski v. United Parcel Serv., Inc.,* Civ. A. No. 3:CV-06-0793, 2009 U.S. Dist. LEXIS 3143, *16 n. 6 (M.D.Pa. Jan. 16,2009) (noting that every court to have addressed the issue of retroactivity concluded that the 2009 amendments cannot be applied retroactively to conduct that preceded its effective date (citing *Walstrom v. City of Altoona,* Civ.A.No. 3:2006-81, 2008 U.S.Dist. LEXIS 104479, at *5 (W.D.Pa. Dec. 29, 2008) (other citations omitted)). Accordingly, this Court likewise concludes that the amendments to the ADA do not apply the present dispute.

>      (3)    Has [no such impairment] but is treated by a covered entity as
>             having a substantially limiting impairment.

*Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 381 (3d Cir. 2002) (citing *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 187 (3d Cir. 1999) (quoting 29 C.F.R. § 1630.2(l)).  Stated another way, "a person is "regarded as" disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities."  *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 521-22 (1999).  Where, as here, the major life activity[11] under consideration is that of working, the Supreme Court has provided the following explication:

> the statutory phrase, "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs. Reflecting this requirement, the EEOC uses a specialized definition of the term "substantially limits" when referring to the major life activity of working:
>
>> "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."

*Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491 (1999)[12] (quoting 29 C.F.R. §1630.2(j)(3)(i)).  In other words, "to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job."  *Murphy,* 527 U.S. at 523 (citing

---

11.  The EEOC defines "major life activities" as those "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. §1630.2(i).  In addition, the court of appeals has held that "thinking" is a major life activity.  *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 307 (3d Cir. 1999).

12.  *Sutton* has been superseded by the ADAAA for those cases subject to the 2008 amendments.  Since this case is not governed by the 2008 amendments, *Sutton* is still good law as to the case at bar.

29 C.F.R. § 1630.2(j)(3)(i)); *see also Taylor v. Pathmark Stores,* 177 F.3d at 192.[13]

In support of their Motion for Summary Judgment, Defendants advance three arguments. First, Defendants submit that Plaintiff cannot establish that any decision makers regarded her as disabled under the law as required to establish a *prima facie* case of discrimination. Second, Defendants contend that Plaintiff cannot establish that any misconception about her physical or mental impairments caused or motivated her termination as required to establish a *prima facie* case of discrimination. Finally, Defendants argue that event if Plaintiff could establish her *prima facie* case, she cannot present any evidence to show that PNC's stated reason for her termination was a pretext for "regarded as" disability discrimination.

## A. Regarded As Disabled

To meet her burden of proof as to a *prima facie* case of "regarded as" disability, PNC argues that Zahavi must show that PNC regarded her as having a physical or mental impairment that impacted a major life activity on a permanent or long-term basis. According to PNC, its mere knowledge of Zahavi's brain aneurysms and related surgeries, without more, is insufficient, as a matter of law, to prove that PNC regarded Zahavi as disabled under the ADA. Rather, PNC submits that Zahavi must prove that PNC regarded her as substantially limited in a major life activity due to this condition, which she cannot do, as there is no evidence in this case that Zahavi's condition had any residual or permanent impact on her major life activities or that DeFalco or Gallagher believed that she suffered from some substantial, long-term or permanent disability.

_____

13. The court of appeals has held that the "[Pennsylvania Human Relations Act] is basically the same as the ADA in relevant aspects and 'Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts.'" *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 382 (3d Cir. 2002) (quoting *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996)). Thus, the Court's findings and holdings here apply equally to Plaintiff's PHRA claim.

In support of its argument, PNC points to Zahavi's own admissions that PNC managers regarded her as highly qualified for her position and a good employee, and gave her positive performance evaluations, after her return to work from surgeries and prior to the discovery of the conduct that led to her termination. (Doc. No. 35 at 9.) In further support of its position, PNC points to Zahavi's admission that she made a full recovery from her aneurysms, with the exception of having lost her sense of smell, that her time away from work for her surgeries was a short period of only months, and that the last leave occurred three years before her allegedly discriminatory termination. (*Id.*) PNC also emphasizes that Zahavi's job duties and her ability to perform those duties were not diminished after her aneurysms, and that even after her surgeries, Gallagher and DeFalco considered her to be one of their top producers on the Indirect Underwriting Team. (*Id.*) PNC dismisses Zahavi's contention that, the comment by her supervisors, "you just don't get it," on several occasions in response to inquiries about the need to follow a new policy related to loan approval procedures, is sufficient to prove PNC regarded Zahavi as disabled under the ADA. (*Id.* at 9-10.) PNC maintains there is no competent evidence in the record to show that the supervisors' comment in any way related to a belief that Zahavi's aneurysms were severe or had a long-term impact on her ability to perform her work for PNC. (*Id.* at 10.) PNC further submits that the undisputed evidence shows that DeFalco made similar comments to other nondisabled employees who questioned the need to follow PNC's guidelines. (*Id.*)

PNC further argues that neither DeFalco nor Gallagher regarded Zahavi as substantially limited in the major life activity of working for two reasons. To the extent that Zahavi contends that such intent can be inferred from her supervisors' questioning of her loan decisions and ability to follow established procedures on several occasions, PNC counters that her supervisors also did this

with other employees who had not suffered aneurysms. Second, PNC submits that Zahavi is unable

to show that she had a substantial limitation on the life activity of working, because she cannot show

that PNC considered her as "unable to work in a broad class of jobs" because of her disability. (Doc.

No. 35 at 10.) PNC maintains that there is no evidence to support a finding that PNC considered

Zahavi unable to work as an underwriter, let alone a broad class of jobs so as to be considered

substantially limited in the major life activity of working under the ADA. Moreover, PNC contends

that it offered Zahavi continued employment after her first and second medical leaves of absence,

which demonstrates that PNC believed Zahavi was capable of performing all aspects of her job, and

in fact, it is not disputed that Zahavi's responsibilities were not diminished when she returned from

her surgeries. After returning from her second surgery, Zahavi was selected to work from home

based on her years of service with PNC and her productivity. Therefore, PNC contends, Zahavi

cannot show, even as to her own underwriter position, that PNC regarded her as unable to perform

its functions due to a perceived disability. (*Id.* at 11.)

In response, Zahavi counters that she has satisfied her burden of establishing a substantial

limitation in the major life activity of working under *Sutton* by presenting evidence that she was

temporarily disabled and  an entire range of jobs involving co-worker interaction and commuting

had been closed to her because of her limitations. Zahavi further submits that she has presented

evidence that PNC's decision makers regarded her as being impaired in the major life activities of

thinking and learning, resulting in her termination for the alleged offense of disregarding policies

of which she was expected to be cognizant. At the very least, Zahavi contends that she has

presented evidence that raises a factual discrepancy as to whether co-workers were addressed in a

similar fashion by her supervisors when they questioned department policy, thereby precluding

summary judgment.  Although Plaintiff's arguments may appear to have some superficial appeal, when closely examined, any merit disappears.

While acknowledging that under *Sutton*, she must "allege" at a minimum that she is unable to work in a broad class of jobs (Doc. No. 40 at 3), Zahavi nonetheless fails to point to where in her complaint she so alleges, and to where in the record any evidence exists that would at least raise an issue of fact as to whether she is unable to work in a broad class of jobs.  Instead, Zahavi attempts to satisfy her burden by arguing that, notwithstanding PNC's attempt to minimize her limitations by arguing that she admitted that she fully recovered post-surgery, she was temporarily disabled and an entire range of jobs involving co-worker interaction and commuting had been closed to her because of her limitations.  (Doc. No. 40 at 3-4.)  In support, Plaintiff hangs her hat on the November 4, 2002 letter from her neurosurgeon, Dr. Zorub, which she submitted to PNC's human resources department.  According to Zahavi, Dr. Zorub's letter established that she was limited in the major life activity of working by physical restrictions which limited her from encountering the "life stresses" of working outside her home and commuting.  (*Id.* at 3.)  The Court disagrees.

A close examination of Dr. Zorub's letter indicates that post-surgery, Zahavi's neurological exam was normal and she did well surgically.  Although Dr. Zorub recommends that she be allowed to work at home due to some generalized fatigue and some anxiety relative to the stresses of life and the daily driving necessary to return to full employment, he in no way placed any limitations on her duties or cognitive abilities, or indicated that she would not be able to perform her underwriting job, let alone an entire range of jobs.  Indeed, Plaintiff's own testimony establishes that her supervisors thought she performed her job well, gave her positive performance evaluations, and recognized her as a top producer.  Also, when asked if her supervisors ever told her that she was unable to fulfill

the duties of any other position, she replied in the negative. (Zahavi Dep. at 183.) Moreover, the evidence shows that DeFalco recommended Zahavi for work at home, without any knowledge of Dr.Zorub's recommendation and Zahavi's request for accommodation. Finally, Plaintiff's request for work at home was made two and one-half years prior to her discharge, making any connection between the two events tenuous at best. In sum, Plaintiff has failed to adduce evidence from which a reasonable jury could find that her supervisors mistakenly believed that her brain surgeries substantially limited her major life activity of working.

In another attempt to satisfy her burden under *Sutton,* Zahavi submits that the record evidence indicates that Gallagher, as well as PNC's human resource department, were not only aware of her disability, but distributed news of it throughout the workplace. (Doc. No. 40 at 4.) However, Plaintiff fails to explain exactly how this unsupported statement satisfies her burden under *Sutton.* Moreover, while the record shows Gallagher and Tina Jones in HR were aware of her brain surgeries, there is simply no evidence that either Gallagher or Jones distributed that information throughout the workplace. DeFalco testified at his deposition that he learned about Zahavi's first surgery from one of her peers who volunteered the information. (DeFalco Dep. at 68-69.) In addition, Zahavi testified that she *assumed* that everyone in the whole building knew what happened to her, because pretty much everyone in her department knew, and bad news travels fast. (Zahavi Dep. at 165-66.) She also *assumed* that Larry Burton from RMCR knew that she had brain surgery, because he signed a get well card and he asked her how she was doing when she returned to work; however, Zahavi admitted that she told him what happened when he asked her how she was feeling. (*Id.* at 166.)

Next, Plaintiff advances the argument that her supervisors believed she was substantially

limited in the major life activities of learning and thinking.  Plaintiff contends that arguments advanced by PNC require the Court to disregard her evidence that she was constantly and repeatedly chastised for her inability to "get" new policies and guidelines relating to loan application procedures.  (Doc. No. 40 at 4.)  In support, Plaintiff cites *Williams v. Philadelphia Housing Auth. Police Dep't,* 380 F.3d 751 (3d Cir. 2004), and in particular, the discussion by the court of the legislative history behind the "as regarded" prong of the definition of disability in the ADA.[14] Without any further analysis, Zahavi argues that based on *Williams,* questions of fact exist vis a vis whether her supervisors also addressed her co-workers in a similar manner whenever they questioned department loan approval policies.  On the one hand, Zahavi notes that DeFalco admitted to sometimes using the phrase, "you just don't get it," when she questioned the need to follow certain loan approval policies.  Zahavi also notes that DeFalco claims to have used the phrase with other underwriters.  (Doc. No. 40 at 5.)  On the other hand, Zahavi proffers her testimony that she never heard her co-workers addressed in that manner, a factual discrepancy which must be resolved in her favor.  Zahavi further submits that she testified that Gallagher used the same phrase constantly, a fact as to which PNC has offered no testimonial denial.  Therefore, Zahavi maintains that repeated references by superior decision makers to an employee's inability to "get" new policies and lending decisions reflects a belief that the employee is impaired in the major life activity of learning.  (*Id.* at 6.)

The Court finds that Plaintiff's argument is not supported by the record.  First, DeFalco

---

14.  The excerpt from *Williams* quoted by Plaintiff addresses the causation element of a *prima facie* case of disability discrimination under the ADA–a person who suffers an adverse employment action because of the myths, fears and stereotypes associated with a disability would be covered under the "regarded as" prong.  380 F.3d at 774.  As explained below, Plaintiff has failed to proffer any evidence that would give rise to an inference that she was terminated because of her supervisors' misconception that she was impaired in the major life activities of learning, thinking, and/or working.

actually stated that he "similarly spoke" with other underwriters when they failed to follow loan approval policies and procedures, not that he used the same phrase. (DeFalco Decl., ¶ 6.) In addition, Plaintiff admits she did not know whether her supervisors used the phrase with co-workers when she was not present. (Indeed, Plaintiff worked at home so she would not have had an opportunity to be present for such discussions except for the occasional Team meeting.) Further, the Court notes there are no affidavits from co-workers in the record supporting Plaintiff's position. Second, Plaintiff's own testimony contradicts her assertions that Gallagher used the phrase constantly. During her deposition, when asked how frequently her supervisors used the phrase, "you just don't get it," Zahavi responded it happened "several times." (Zahavi Dep. at 73.) She further testified that it did not happen every time she questioned a loan or policy, but "enough that [she] didn't like it." (*Id.* at 74.)

Giving Plaintiff the benefit of all favorable inferences, the Court concludes that a reasonable jury could not conclude that Plaintiff's supervisors mistakenly believed Plaintiff was significantly impaired in the major life activities of learning and thinking. The undisputed evidence shows her supervisors regarded her as a good employee, team player, top producer, and gave her positive performance ratings, and the remark, "you just don't get it" was made *in response* to Plaintiff's challenges to department loan application policies and guidelines, because she just would not accept that established policies had to be followed (DeFalco Decl., ¶ 6). In addition, this remark was made on "several" occasions, not "repeatedly" as Plaintiff argues in her brief. Although the evidence shows that Plaintiff's supervisors did not address the other underwriters on her Team in the same manner at Team meetings when they questioned department policies/procedures, Plaintiff fails to explain how this proves that her supervisors believed she was significantly limited in the major life

activities of learning and thinking.[15]  Accordingly, the Court finds that Plaintiff has failed to satisfy her burden under the first prong of her *prima facie* case of proving that her supervisors regarded her as disabled under the ADA.

**B.      Plaintiff's Termination Was Not Based on Discriminatory Motives**

Even if Plaintiff could satisfy her burden under the first prong, her *prima facie* case of as regarded disability discrimination still fails because she cannot show that she was terminated because of PNC's alleged misconceptions that she was disabled due to her brain surgeries.

On this front, PNC argues that Zahavi cannot satisfy her burden because she offers only broad, conclusory and unsupported allegations to attack its reasons for terminating her, and consequently, provides no factual evidence from which a reasonable jury could conclude that she was terminated because of her brain surgeries.  (Doc. No. 35 at 12.)  Specifically, PNC contends that there is no evidence to support her speculation that RMCR employees conspired with DeFalco and Gallagher to more closely scrutinize her work for errors in April 2005 because of aneurysms she suffered more than three years earlier.  By contrast, PNC submits that the record contains ample, undisputed evidence to support PNC's legitimate, non-discriminatory reason for Zahavi's termination–manipulation of PNC's loan application process, in violation of its Code of Ethics. PNC submits that the RMCR risk analyst who spoke to DeFalco regarding the suspicious loan applications did not know Zahavi's identity, let alone her medical history.  Thus, PNC contends it

---

15.  Zahavi also asserts, in conclusory fashion, that there is evidence that DeFalco and Gallagher allowed similarly situated loan officers the discretion to use "common sense" in making loan decisions but denied Zahavi that privilege, thus raising the inference that they believed her to be lacking in that attribute. (Doc. No. 40 at 6.)  The record does not support this assertion.  In fact, Zahavi's contention is belied by her own admission that she was told to exercise good judgment with the dealers and had discretion to approve deals without obtaining proof of additional income if the deal "made sense."  (Zahavi Dep. at 89, 137, 139-140.)

did not terminate her because of any perceived disability, but rather, due to her blatant manipulation of its loan approval process, in violation of its strictly enforced Code of Ethics. Plaintiff's dishonesty rendered her ineligible for coverage under its fidelity bond and therefore disqualified her from employment with PNC.

In response, Zahavi points out what she believes are infirmities with PNC's proffered legitimate, nondiscriminatory reason for her termination. In essence, to satisfy the causation element, Plaintiff attempts to show that others who were similarly situated committed similar errors but were only counseled while she was terminated. In support of this argument, Plaintiff points out that Burton's review (December 2004 RMCR report finding 27 errors, 14 of which were Zahavi's), cited seven instances where the debt/income ratio exceeded 75%, as in the original Bartell loan application, yet Zahavi was terminated for exceeding the guidelines in one instance. Zahavi further notes several items in the 2004 RMCR report: (1) criticizing of another underwriter (unidentified) for approving income at a certain amount without documentation on rental income on which DeFalco noted agreement; (2) cited department-wide perceived deficiencies in calculating debt/income ratio ("D/I"), including a transaction where a borrow's revolving payments were adjusted out of the calculation–essentially what Zahavi did when she inadvertently omitted the motorcycle loan from the Bartell loan application, yet management response was only that the employees involved had been counseled, not terminated, for the deficiencies in D/I calculations. (Doc. No. 40 at 9.) Unfortunately for Plaintiff, there is nothing in this proffered evidence that suggests that she was treated less favorably because of her perceived disability.

In assessing whether non-disabled employees are similarly situated to a regarded as disabled employee, the Court is required to look at the "'particular criteria or qualifications identified by the

employer as the reason for the adverse action.'"[16] *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 359 (3d Cir. 1999) (quoting *Simpson v. Kay Jewelers,* 142 F.3d 639, 647 (3d Cir. 1998)). In the context of a discriminatory discipline claim, the courts have found employees to be similarly situated only when they are involved in or accused of the same offense and are disciplined in different ways. *Wheeler v. Aventis Pharmaceuticals,* 360 F.3d 853, 858 (8th Cir. 2004) (citation omitted). In the Third Circuit, the district courts have expounded on this test:

> "In order for employees to be deemed similarly situated, it has been determined that the individuals with whom the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Ogden v. Keystone Residence,* 226 F.Supp. 2d 588, 603 (M.D.Pa. 2002) (quoting *Morris v. G.E. Financial Assurance Holdings,* No. 00-3849, 2001 WL 1558039, at *6 (E.D.Pa. Dec. 3, 2001)); *Tyler v. SEPTA,* No. Civ. A. 99-4825, 2002 WL 31965896, at * 3 (E.D.Pa. Nov. 8, 2002), *aff'd without op.* 85 Fed. Appx. 875 (3d Cir. 2003) (to show that a particular employee is similarly situated, the employee's acts must be of comparable seriousness to plaintiff's own infraction, and engaged in the same conduct without such differentiating or mitigating circumstances). Moreover, at the *prima facie* prong of the analysis, "evidence of differential treatment of 'a single member of the non-protected class is insufficient to give rise to an inference of discrimination.'" *Pivirotti,* 191 F.3d at 359 (quoting *Simpson,* 142 F.3d at 646).

---

16. Neither the employee's positive performance in another category, nor his judgment as to the importance of the stated criteria, is relevant in making this determination. *Simpson v. Kay Jewelers,* 142 F.3d 639, 647 (3d Cir. 1998) (citing *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1216 (3d Cir. 1988)).

In the case at bar, Plaintiff has failed to presented any evidence to establish that the employees involved in the cited transactions were similarly situated. In particular, PNC's articulated, non-discriminatory reason for terminating Plaintiff was her alleged manipulation and/or falsification of the data on the second Bartell loan application in violation of PNC's Code of Ethics; however, there is no evidence to suggest that the employees in the two examples cited by Plaintiff manipulated and/or falsified data on a loan application to avoid obtaining management approval. Even more basic, the identities of the other individuals are not provided, and thus, one cannot even begin to determine the similarities in such a vacuum.

To the extent that Plaintiff attempts to show discriminatory animus based on Larry Burton supposedly being "out to get her,"such reliance is misplaced. First, Zahavi stated in her deposition that she did not know what DeFalco meant when he told her Burton was out to get her. Second, the evidence does not suggest that either Burton or the other risk analyst in RMCR knew who the underwriter was at the time they brought the suspicious loan application to DeFalco's attention, despite the fact that Plaintiff's employee number was on the loan application. Plaintiff has not shown that the risk analysts from outside her department would have access to her employee number, and DeFalco testified that neither risk analyst knew the identity of the underwriter when they first approached him with the suspicious loan applications. In any event, there is simply no proof that Burton singled her out because he perceived her to be disabled. Nor is there any evidence that DeFalco and Gallagher singled Zahavi out for auditing because they perceived her to be disabled–indeed, the audit was initiated by RMCR as part of its regular, independent review process. Under these circumstances, the Court cannot find any discriminatory animus on the part of

Plaintiff's supervisors.[17]

Accordingly, the Court finds that Plaintiff has failed to show that her termination was based on her supervisors mistaken beliefs that she was substantially impaired in the major life activities of learning, thinking, and/or working.[18]

## IV.    CONCLUSION

For the reasons set forth above, the Court will grant Defendants' Motion for Summary Judgment.  An appropriate Order follows.

---

17.  The Court notes that elsewhere in her brief, Zahavi submits that her supervisors' remark, "you just don't get it," often in a public setting, when coupled with the "undisputed" fact that her medical condition was "leaked" to the employee population at large, reflect a corporate culture in which disability is disrespected and ridiculed, and in any event, may be probative of the environment in which the employment decision was made.  (Doc. No. 40 at 6.)  To the extent Plaintiff's attempts to assert this argument  as proof of the causation element of her  *prima facie* case, it too must fail.  As noted above, there is no evidence that her medical condition was "leaked" to the workplace at large, and therefore, no inference that PNC harbored a discriminatory animus towards individuals with disabilities or perceived disabilities.

18.  Because the Court has concluded that Plaintiff has not met her burden at step one–establishing a *prima facie* case of regarded as disability under the ADA, it does not reach PNC's third argument under the third step of the *McDonnell Douglas* test.

Dated: March 31, 2009                    BY THE COURT:

LISA PUPO LENIHAN
U.S. Magistrate Judge

cc:     All Counsel of Record
        *Via Electronic Mail*